Filed 2/27/13  In re L.C. CA3

**NOT TO BE PUBLISHED**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re L.C., a Person Coming Under the Juvenile Court Law. | C071640 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. JD230275) |
| Plaintiff and Respondent, | |
| v. | |
| B.C., | |
| Defendant and Appellant. | |

Appellant B.C., mother of the minor L.C., appeals from the juvenile court's order terminating her parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  She contends the juvenile court erred in denying her section 388 petition for modification and in finding that the beneficial parental relationship exception to adoption did not apply.  We shall affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

# FACTUAL BACKGROUND

On October 29, 2009, the Sacramento Department of Health and Human Services (DHHS) filed a section 300 petition on behalf of the then five-year-old minor, due to mother's long-standing, untreated substance abuse problem and her ongoing psychiatric problems, which impair her judgment and ability to provide adequate care and supervision of the minor. Mother had been abusing methamphetamine and phencyclidine, as well as marijuana and cocaine, which she first used as a teenager and had been using on a daily basis at the time the petition was filed. She had previously abstained from drugs for five years but relapsed in 2007 due to " 'pressure.' " She did not, however, believe that drugs and alcohol were a problem for her.

Mother had been diagnosed with posttraumatic stress disorder (PTSD) and bipolar disorder, and had been prescribed Abilify and Wellbutrin. Although mother believed she was " 'very' " compliant with her medication regimen and was doing " 'fine,' " she indicated she has had suicidal ideations, had experienced hearing voices in her head, and had been placed on a section 5150 hold in May 2009. The minor, who had been raised by the maternal grandmother until she was 17 months old due to mother's incarceration, was bonded to mother, although very parentified.

The juvenile court sustained the allegations in the petition and adjudged the minor a dependent child of the court. Mother had failed to reunify with the minor's half sibling and her parental rights to that child were terminated in 2004. The juvenile court, however, found reunification services would benefit the minor and ordered services, including substantial services to address mother's drug abuse and psychiatric problems. The minor was placed in the home of her maternal uncle.

Mother completed a 90-day residential drug treatment program in February 2010. She was compliant with her Specialized Treatment and Recovery Services program (STARS) and Proposition 36 drug court requirements, had completed a parenting

2

education series, and was actively engaged in group counseling. By April 2010, mother was medication compliant and had five months of sobriety.

The minor had been moved to a foster family home in February 2010 and mother was visiting twice a week for two-hour visits. Over a series of visits, mother failed to substantially interact with the minor and permitted her boyfriend (whom the minor stated she did not like) to attend more visits than authorized. However, on April 15, 2010, after a series of positive visits, DHHS authorized a weekly four-hour unsupervised visit.

At the end of May 2010, DHHS authorized overnight/weekend visits with mother, in the home she shared with her boyfriend. In June 2010, the minor stated she enjoyed her time with mother and was ready to live with her, but she did not feel her mother was ready for her. On July 9, 2010, after additional extended overnight visits and counseling, the juvenile court returned the minor to mother with family maintenance services.

On July 26, 2010, mother tested positive for benzodiazepines (with no authorized prescription) and admitted to using methamphetamine. Mother tested positive for methamphetamine on July 27, 2010, after which she agreed to place the minor in a voluntary placement until she was able to submit to a series of clean tests and enter a four-day outpatient treatment program.

Mother tested positive for methamphetamine again on July 29, 2010. After testing clean on August 2 and 4, 2010, the minor was returned to her care. However, on September 14, 2010, mother's STARS specialist expressed concern that mother was not actively participating in her treatment and that she lacked support from her live-in boyfriend. Mother reported feeling overwhelmed by her treatment and meeting the minor's needs and, on September 23, 2010, called the STARS specialist and stated she did not have her psychotropic medications and was having a difficult "down." Mother stated she had not been taking her psychotropic medications for the past two weeks because she had been unable to pick them up.

3

DHHS filed a supplemental section 387 petition on September 27, 2010. The juvenile court found the minor at substantial risk and ordered her detained.

Mother was discharged from her outpatient program in September 2010, due to noncompliance. She did not participate in her treatment programs in October and November 2010 because she was in " 'depression mode.' " She resumed her medication regimen, including a new medication (Depakote). Mother admitted that she hears voices in her head when she does not take her medications but thought that everyone heard such voices and did not believe her mental health affected her ability to parent the minor, even when she was not on her medication. The voices " 'talk shit' " about her, which angers her, and she walks around " 'looking mean.' " Mother also acknowledged former domestic violence between her and her live-in boyfriend but stated that her boyfriend was participating in anger management services. On December 3, 2010, the juvenile court sustained the section 387 petition, ordered further reunification services, and set a section 366.22 hearing for April 2011.

By April 2011, mother was still struggling with stabilizing her mental and physical health, and had not yet engaged either individual or group counseling. She had been diagnosed with schizoaffective disorder and PTSD, and was prescribed Wellbutrin, Risperdal, and Depakote. Mother had begun a six-month treatment program but did not attend regularly for the first three months. She reported periodic anxiety that prevented her from leaving the house, dizziness, and periods of being unable to open her eyes. She was also arrested for driving under the influence in January 2011. Her attendance eventually improved and, by April 2011, she successfully completed the program and agreed to continue twice weekly processing groups. Her last positive drug test was on January 27, 2011.

Visits with the minor, however, did not go well after she was detained on September 23, 2010. Mother was authorized to visit the minor one hour per week.

4

Mother was at least 30 minutes late on September 30, 2010, and brought her boyfriend to the October 8, 2010, visit, despite being told he was not permitted to attend. Mother cancelled 30 minutes before the scheduled visit on October 14, 2010, and the October 21, 2010 visit was cancelled due to mother's failure to confirm. Mother became more consistent so, on December 3, 2010, DHHS increased the duration of visits to two hours.

Mother attended all three of her scheduled December 2010 visits and the visits reportedly went well. Mother, however, was unable to visit from January 1 to January 9, 2011, due to her incarceration. Three visits later, on February 3, 2011, she brought her boyfriend to the visit and then fell asleep for 40 minutes of the visit time. Mother requested the February 16, 2011 visit end 30 minutes early because she did not feel well.

In a letter dated February 17, 2011, the minor's therapist stated the treatment team was now opposing contact between the minor and mother, stating it was in the minor's best interest not to have any contact with mother "at this time." Mother had demonstrated volatile behavior on several occasions during visits with the minor and the minor was experiencing anxiety due to wondering whether mother would show up for the visit and, if so, what would take place. The minor was fearful that mother would bring her boyfriend to visits when it was unauthorized and then become angry and yell if confronted. The minor's teacher had also reported that the minor was often anxious about visits two or more days in advance of mother's visits.

Nonetheless, the visits continued. The minor generally enjoyed and looked forward to visits with mother, although some of the visits caused her to worry about mother because of mother's condition. Now six years old, the minor wanted to go home with mother so she could take care of mother and did not understand why she was not permitted to do so.

On March 2, 2011, mother again requested the visit be abbreviated due to not feeling well. Mother had her eyes closed through most of the one-hour visit on that date, as well as during the March 9, 2011 visit.

Mother ended the April 6, 2011 visit early so she could go to a class, and cancelled the April 13, 2011 visit right before it was scheduled, stating she could not find her bus pass. She also cancelled the April 20, 2011 visit because she was dizzy, and arrived late on April 25, 2011. Mother appeared to be sick at the May 11, 2011 visit and was having difficulty keeping her eyes open. The minor went to her and pulled on her eyelids to open them. Mother cancelled the May 18, 2011 visit in the afternoon because she missed her bus, and cancelled the May 25, 2011 visit in the afternoon because she was hit by a car while riding her bike.

On June 28, 2011, the juvenile court terminated mother's reunification services and ordered long-term placement with a goal of return to mother. The court found the minor was closely and positively bonded with mother and there was no party able or willing to assume guardianship at that time.

Mother cancelled or failed to appear for scheduled visits on July 6, August 3, and August 25, 2011. Due to mother's inconsistency in visiting and the impact it was having on the minor, DHHS reduced visitation on August 26, 2011, from once per week to bimonthly. A September 8, 2011 therapy report reiterated the negative impact that mother's inconsistency was having on the minor, stating: "[The minor] continues to experience sadness, worrying, anger, irritability, and anxiety around her visits with bio mother and not being able to live with her." The minor's anxiety surrounding visits was reported to be seen the day before, as the minor worried whether mother would show up for the visit and be healthy enough to spend time with her. Her anxiety and accompanying negative behavior had greatly improved after visits were reduced to bimonthly and mother had since become more consistent. The minor reported to her

therapist that visits every other week were " 'enough' " and she feels " 'relaxed,' " rather than excited or nervous, about them. Now age seven, the minor also expressed that she wanted to live with her foster parents.

On November 29, 2011, mother filed a section 388 petition for modification, seeking placement of the minor in her care. She claimed to have maintained her sobriety, was attending four to five Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings each week, was medication compliant, and had stable housing with the maternal grandmother. DHHS filed a postpermanency report the following week, noting mother's reported erratic and volatile behavior at visits, creating anxiety and worry for the minor. The minor reported to be " 'always happy' " but according to the mental status examination, her mood " 'at times will be sad, irritable or anxious. Most often related to anticipation of visit with bio mother.' " Regarding placement, the minor appeared genuinely comfortable and happy in the foster home where she had been placed since February 2010 (with the exception of the time in July through September 2010 when the minor had been placed with mother). The foster parents hoped to provide permanency for the minor.

The juvenile court denied mother's request for return of the minor, finding mother had not met her burden to show changed circumstances or that return was in the minor's best interest. The juvenile court noted that the minor's relationship with mother was less than positive, and caused the minor anxiety, worry, and concern. Finding it was in the minor's best interest to stabilize in a permanent situation, the court ordered DHHS to do an adoption assessment.

In an April 24, 2012 report prepared for the section 366.26 hearing, DHHS reported the minor's foster parents were committed to adopting the minor; the minor was comfortable in their home; and the minor stated she wanted to stay there and be adopted. Mother had maintained contact and talked and played with the minor during visits.

7

Mother was still having trouble seeing, which caused concern for the minor, and the minor had to guide her out of the building on one occasion. During the last visit, the minor, now age eight, was affectionate with mother only when mother prompted her and was easily able to separate from mother at the end of the visit. The minor was observed to be more distant with mother, had not appeared interested in speaking to mother on the telephone, and was not asking for mother between visits. The minor had made significant academic progress and was on target in all subjects. She was no longer in therapy and appeared well adjusted. DHHS recommended termination of parental rights.

In May 2012 mother filed a section 388 petition for modification, again seeking return of the minor to her care. Mother claimed to have maintained sobriety for over a year, was attending at least two NA/AA meetings a week, was medication compliant, had stable housing with the maternal grandmother, had a strong and positive bond with the minor, and understood her mental health and substance abuse problems and how they had affected the minor.

At the combined contested hearing in July 2012, however, mother testified that she had not actually been attending the NA/AA "process" (support) groups in the six months prior to the hearing. She also testified that she had recently (within the previous month to three months) been taken off Depakote, due to her complaints about the side effects, and was still hearing voices in her head. On occasions when that occurs, she feels like she cannot leave the house or, if in a store, feels like she must leave immediately. This has occurred in the minor's presence. When asked specifically, she was unable to explain how her mental health problems affected the minor, other than to state that she knew she had to take care of herself in order to take care of the minor. And mother did not understand why the minor was removed from her custody in September 2010.

Mother testified she was still having problems opening her eyes, requiring the assistance of another when it occurs, and knows that the condition causes the minor to be

8

concerned.  She was still in a wheelchair from her bicycle/car accident in May and unable to work due to her mental disability.  Both mother and the maternal grandmother testified that the minor has become more distant with mother.  She had stopped asking to see mother more often.  Mother noted that the minor began visits "a little hesitant, kind of to see what my reaction is" or "kind of feeling out the mood before she knows how she can feel."

The juvenile court denied mother's request for modification, finding mother was still struggling with her physical and mental health, and that return of the minor to mother was not in the minor's best interest.  The court then found the minor adoptable, found the beneficial parental relationship exception to adoption did not apply because termination would not be detrimental to the minor, and terminated parental rights.

## DISCUSSION

### I.  Denial of the Section 388 Petition

Mother contends the juvenile court abused its discretion by denying her section 388 petition.  We disagree.

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances, and that changing the order will serve the minor's best interests.  (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 671-672.)  The petitioner has the burden of proof on both points by a preponderance of the evidence.  (Cal. Rules of Court, rule 5.570(h)(1)(D).)  In assessing the petition, the court may consider the entire history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Where a section 388 petition has been denied after an evidentiary hearing, we review for abuse of discretion.  (*In re S.R.* (2009) 173 Cal.App.4th 864, 866.)  We reverse only if the ruling exceeded the scope of the court's discretion, or if under all the evidence

9

(including reasonable inferences from the evidence), viewed most favorably to the ruling, no reasonable judge could have made that ruling. (*Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, 1459; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).) Where the evidence conflicts, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1529.)

When a parent brings a section 388 petition after the termination of reunification services, the best interests of the child are of paramount importance. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Therefore, the juvenile court looks not to the parent's interest in reunification but to the child's need for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Here, mother brought the section 388 seeking return of the minor to her custody. The juvenile court found such an order would not be in the minor's best interests. We agree.

Mother's rehabilitation from a 17-year drug habit, which by her own account included a relapse after five years of sobriety, and from which she relapsed within a month of the last time the minor was returned to her, is still far from complete or certain. (Cf. *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months of sobriety did not outweigh long history of addiction and relapses].) And while mother emphasizes that she had completed a drug treatment program and was participating in twice weekly process groups (although, admittedly, she had not been participating in those groups for the six months leading up to the hearing), she had completed a drug treatment program and participated in similar process groups before the last time the minor was returned to her. Additionally, although mother argues she is now medication compliant, she had also been reportedly medication compliant prior to her last relapse and removal of the minor. Moreover, mother had recently stopped taking one of the medications and was still

10

hearing voices in her head that she was unable to differentiate from real voices. Mother was also still unable to delineate how her mental illness has and does affect the minor. Finally, at the time of the hearing, mother had significant physical health issues to which she was still adjusting, rendering her unable to open her eyes for periods of time and unable to ambulate as a result of her bicycle/car accident.

Under these circumstances, the juvenile court reasonably found that the success of returning the minor to mother's custody was exceedingly uncertain and would further defer the goals of permanence and stability in contravention of the minor's best interest. (Cf. *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) We find no abuse of discretion.

## II. Parental Relationship Exception

Mother contends the juvenile court erred by finding that the beneficial parental relationship exception to adoption did not apply. We discern no error.

If reunification efforts have failed, as they have here, and the minor is adoptable, the court must select adoption unless under section 366.26 "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" under at least one of six exceptions. (§ 366.26, subd. (c)(1)(B).) Under this provision, "the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.*, *supra,* 31 Cal.4th at p. 53, quoting *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.)

11

The parent has the burden of establishing by a preponderance of the evidence that a statutory exception to adoption applies. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 998; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) DHHS need not establish that the minor would *not* benefit from continued parental contact. (*In re Angel. B.* (2002) 97 Cal.App.4th 454, 466 (*Angel B.*).)

To establish that the beneficial parental relationship exception to adoption applies, the parent must show that termination of parental rights would be detrimental to the minor because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) When the juvenile court rejects an exception to adoption, we review the court's finding deferentially. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [whether standard of review deemed substantial evidence or abuse of discretion, broad deference to lower court required]; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [abuse of discretion]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence].)

To prove that the beneficial parental relationship exception applies, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527.) Moreover, it is not enough simply to show "some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349.) "[T]he parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment

12

such that the child would be *greatly* harmed." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) The natural parent-child relationship must be proven to " 'promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *Jasmine D., supra*, 78 Cal.App.4th at p. 1345.) " 'In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.' " (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)[2]

Here, although mother had a significant period of inconsistent visitation, she did maintain contact with the minor, and was relatively consistent once visitation was reduced to bimonthly visits. However, the minor had spent the better part of the last two years out of mother's custody and with her prospective adoptive family. Her bond with mother had waned significantly and was not entirely positive. The minor was parentified toward mother and mother's condition and behavior caused her anxiety and concern. The minor's emotional health had improved since visits with mother were reduced and she had no trouble separating after visits. There was simply no evidence to suggest that the minor would be greatly harmed if parental rights were terminated and, as such, mother failed to meet her burden.

---

[2] The above standard of proof set forth in *Autumn H.*, *supra*, 27 Cal.App.4th 567 is well established. Mother argues that *Autumn H.* and its progeny misconstrue the statutory requirement, and urges this court to reconsider the definition of "benefit" so as not to require the balancing test. The court in *Jasmine D.*, *supra*, 78 Cal.App.4th 1339 thoroughly examined this same contention and concluded that *Autumn H.* and its progeny properly interpreted the parent's burden in establishing the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(A). (*Jasmine D.*, *supra*, at pp. 1348-1350.) We decline to revisit the argument again here.

13

The minor was happy and well adjusted in her prospective adoptive home. Her interest in permanence and stability had to control at this stage of the proceedings, and the juvenile court reasonably found that that interest would best be served by adoption. Substantial evidence clearly supported the juvenile court's finding that the beneficial parental relationship exception to adoption did not apply.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                                                   BUTZ               , J.


We concur:


_____ROBIE_____, Acting P. J.


_____DUARTE_____, J.